1

**BOUTIN GIBSON DI GIUSTO HODELL INC.**

2
ROBERT D. SWANSON, SBN 162816
MICHAEL E. CHASE, SBN 214506

3
555 Capitol Mall, Suite 1500
Sacramento, CA  95814

4
Telephone (916) 321-4444
Facsimile (916) 441-7597

5

6
**LAW OFFICES OF ANDRÉ HASSID**
ANDRÉ HASSID, SBN 66145

7
670 Augusta Drive
Moraga, California 94556

8
Telephone (925) 247-0050
Facsimile (925) 871-4067

9

Attorneys for Bank of Sacramento

10

11
## UNITED STATES DISTRICT COURT

12
### EASTERN DISTRICT OF CALIFORNIA

13

14
BANK OF SACRAMENTO, a California
corporation,

15
                        Plaintiff,

16
            vs.

17

STEWART TITLE GUARANTY COMPANY, a
Texas corporation,

18

19
                        Defendant.

20

| | |
|---|---|
| ) | **Case No.:  2:09-cv-00771 JAM KJM** |
| ) | |
| ) | |
| ) | |
| ) | **Date:        June 16, 2010** |
| ) | **Time:          9:30 a.m.** |
| ) | **Judge:       Hon. John A. Mendez** |
| ) | **Courtroom: 6** |
| ) | **Trial Date:  June 13, 2011** |
| ) | |
| ) | |
| ) | |
| ) | |

21

22
## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO

23
## DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

24

25

26

27

28

1
2

# TABLE OF CONTENTS

3   MEMORANDUM OF POINTS AND AUTHORITIES.................................................1

4   INTRODUCTION.................................................................................................1

5   STATEMENT OF FACTS.....................................................................................3

6      The Andrews Dixon Suit ...............................................................................3

7      STG Policy ......................................................................................................3

8      STG's Improper Conduct ..............................................................................5

9      Settlement of Andrews Dixon Action ............................................................6

10     STG Dismisses Declaratory Relief Action ...................................................7

11     Bank's Claim for Loss and Damages ............................................................7

12  ARGUMENTS........................................................................................................8

13     A.  This Is Not an "Extraordinary" Case Warranting any Dismissal under Rule 12(b)(6)..8

14     B.  The Bank Has Sufficiently Pled It Suffered Loss and Damage Covered by the Policy...9

15     C.  The Policy Limitations Cited By STG Do Not Apply ...................................11

16       1.  STG Has the Burden of Proving Its Exceptions to Coverage Apply..........12

17       2.  STG is Unable to Prove As a Matter of Law That It has Met the Elements Required

18       to Assert Its Exclusion ...............................................................................13

19       3. The Bank Provided Substantial Consideration for the Settlement of the Andrews

20       Dixon Action In Order To Make the Title Marketable.......................................14

21       4.  Limitations in Section 8 are meant to Be Read Together, Not in Isolation .................14

22       5.  Reasonable Diligence is Required and is a Question of Fact ........................15

23       6.  Section 8 (b) Does Not Terminate STG's Coverage Under the Facts Alleged ...........17

24     D. The Bank's Loss Was Caused By The Unmarketability of its Title Due to the Option

25     Agreement and Memorandum of Option Agreement ........................................22

26
27
28

1

**E. The Complaint Alleges Substantial Evidence of Bad Faith Conduct of STG**..................**24**

2

**CONCLUSION** ...........................................................................................................**26**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Cases**

*Aydin Corp. v. First State Ins. Co.* **(1998) 18 Cal.4th 1183** ........................................................**13**

*Bell Atlantic Corp. v. Twombly*, **550 U.S. 544 (2007)**....................................................................**8**

*Cocoa Properties, Inc. v. Commonwealth Land Title Insurance Company* **590 So. 2d 989 (Fla.**

    **App. 1991)**............................................................................................................**passim**

*Continental Ins. Co. v. Superior Court* **37 Cal. App. 4th 69, 85 n.11 (1995)** ...........................**22**

*Cruz v. Beto*, **405 U.S. 319  (1972)** ....................................................................................................**8**

*Dalrymple v. United Service Auto. Ass'n* **40 Cal. App. 4th 497 (1995)** .......................................**25**

*First Federal Savings Bank of Brunswick v. Stewart Title Guaranty Co.*, **451 S.E.2d 916, 917**

    **(1994)**..........................................................................................................................**21**

*Gilligan v. Jamco Develop. Corp.*, **108 F.3d 246 (9th Cir. 1997)** ................................................**8**

*Gray v. Zurich* **(1966) 65 Cal. 2d 263** .............................................................................................**13**

*Hall v. City of Santa Barbara*, **833 F.2d 1270 (9th Cir. 1986)** ....................................................**8**

*Hatch v. First American Title Insurance Company* **895 F.Supp. 10 (D.Mass. 1995)** .........**passim**

*Lick Mill Creek Apartments v. Chi. Title Ins. Co.* **231 Cal.App.3d 1654 (1991)**............................**9**

*MacKinnon v. Truck Ins. Exchange* **(2003) 31 Cal. 4th 635**...................................................**2, 13**

*McCoy v. Progressive West Ins. Co.*, **171 Cal.App.4th 785 (2009)** .............................................**25**

*Mosier v. Southern California Physicians Insurance Exchange*  **63 Cal.App.4th 1022 (1998)**.**25**

*Nebo Inc. v. Transamerica Title Insurance Co.* **21 Cal.App.3d 222 (1971)** .......................**passim**

*Retail Clerks Int'l Ass'n v. Schermerhorn*, **373 U.S. 746**..............................................................**8**

*Rosen v. State Farm General Ins. Co.* **30 Cal.4th 1070, 1073 (2003)** ........................................**16**

*Safeco Ins. Co. of Am. v. J & D Painting*, **17 Cal. App. 4th 1199 (1993)**...................................**22**

*Safeco Title Ins. Co. v. Moskopoulos* **116 Cal.App.3d 658 (1981)**..............................................**10**

*San Diego Federal Credit Union v. Cumis Ins. Society, Inc.*  **162 Cal.App.3d 358 (1984)** ........**25**

*State Farm Mut. Auto Ins. Co. v. Jacober* **(1973) 10 Cal.3d 193** ................................................**13**

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ............................................................8

*United States v. City of Redwood City*, 640 F.2d 963 (9th Cir. 1981) ............................8

*White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870 .....................................................11

**Statutes**

**Rule 12(b)(6)** ...................................................................................................................8

**Treatises**

**Alice L. Akawi, et al., California Title Insurance Practice § 6.44 (CEB 2d ed. 2009**

**update)** ...................................................................................................................10

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Bank of Sacramento ("the Bank") respectfully submits this memorandum of points and authorities in opposition to the Motion to Dismiss the Second Amended Complaint filed on behalf of defendant Stewart Title Guaranty Company ("STG").

## INTRODUCTION

The Bank's Second Amended Complaint ("SAC") alleges claims for breach of contract and breach of the implied covenant of good faith and fair dealing. In 2006, the Bank purchased a title insurance policy from STG to insure against any loss or damage incurred from defects in, encumbrances on or unmarketability of the title of the property that served as collateral for a loan. The Bank suffered covered loss and damage in excess of $8.7 million as a result of the unmarketability of title to the subject real property stemming from an adverse claim involving an Option Agreement and Memorandum of Option Agreement that predated STG's title insurance policy. STG's policy expressly listed the Memorandum of Option Agreement and insured the Bank's interest in the title would have priority. Although STG ignores this point throughout its brief, the complaint alleges the Bank's loss and damage fall within the coverage grant of STG's policy.

STG denied the Bank's claim for policy benefits, alleged it had removed the claim against the title, and contended the Bank was not entitled to recover under the policy because there had been no adverse final judgment against the Bank. STG continues to deny the claim, asserts that it is irrelevant if it failed to act with reasonable diligence and contends the loss is not covered because of a limitation in section 8(b) of its policy which when read in isolation does not contain reasonable diligence language. STG erroneously claims that it alone cured the defect in the title and asks the court to read section 8(b) in isolation, ignoring the other provisions in the policy that require STG to use reasonable diligence. To reach its conclusion, STG ignores sections 4(a) and (b) of the Conditions and Stipulations which requires STG to act *diligently* and defend the suit *without unreasonable delay* – conditions that are embedded in every other provision in the policy. It also asks the court to ignore provisions of section 8 (a) that relieve STG of liability only when it has established title "*in a reasonably diligent manner.*"

-1-

1    In California, all coverage exclusions and exceptions are interpreted narrowly, and it is

2    the burden of the insurer to prove its exclusions and limitations apply.  *MacKinnon v. Truck Ins.*

3    *Exchange*, 31 Cal. 4th 635, 648 (2003).  Among the many problems with STG's position is that it

4    has failed to meet two elements necessary before it can invoke the limitation: 1. It must use

5    reasonable diligence to clear the defect in the title and render the title marketable; and 2. It must

6    itself pay the consideration used to clear the title, and not use the insured's money or other

7    consideration.  The Second Amended Complaint alleges facts that show STG has failed to meet

8    either pre-condition to terminate its liability.

9    Far from using reasonable diligence to clear the title, STG embarked on a pattern of

10   reprehensible and time-consuming conduct that substantially delayed restoring the marketability

11   of the Bank's title to the subject property.   STG breached its duties under the insurance contract

12   in multiple ways including initially promising to defend the Bank without a reservation of rights;

13   then reneging on this promise and raising obstacles to coverage; then promising a second time to

14   defend and indemnify without a reservation of rights; then reneging on its promise again;

15   improperly altering the policy in an attempt to evade coverage; improperly insinuating itself into

16   attorney-client privileged communications in order to use information it gained against its

17   insured;  and unreasonably filing a declaratory relief action against the Bank knowing it had no

18   reasonable grounds to file the action.  STG's recent dismissal of its declaratory relief action, and

19   its payment to the Bank of "Brandt fees" incurred by the Bank in defending against the

20   declaratory relief action,[1] is tantamount to an admission that it filed the action without reasonable

21   grounds and that it failed to use reasonable diligence to clear title.  The issue of whether STG

22   used "reasonable diligence" to clear the title is necessarily an issue to be determined by the trier

23   of fact, and thus STG is not entitled to have the issue decided on a motion to dismiss or on a

24   motion for summary judgment.  *Nebo Inc. v. Transamerica Title Insurance Co*., 21 Cal.App.3d

25   222, 228 (1971) ("What constitutes a reasonable time is a question of fact.").

26   

27   [1]    "Brandt fees" are attorney's fees incurred by an insured which are required to be
     reimbursed by the insurance company upon a finding the company has acted in bad faith.  *See*
28   *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985).

1    Although STG paid money to help clear the title, the settlement negotiated by STG

2  required that the Bank agree to a mutual dismissal with prejudice.  The Bank was forced to give

3  up its claims against a third party, Andrews Dixon. (Defendants' Exhibit F, ¶ 6; SAC ¶ 27).

4  Four days before the settlement was reached, STG stated in writing "the Bank holds significant

5  potential counterclaims against Andrews Dixon" and it believed the Bank "could recover its

6  principal from Andrews Dixon," as well as recover "against Andrews Dixon for fraud in the

7  inducement."  (SAC ¶ 26).  Given that the amount of original principal that STG was stating the

8  Bank could recover from Andrews Dixon was <u>$10.8 million</u>, the amount of consideration given

9  by the Bank as part of the mutual release in the settlement with Andrews Dixon was five-fold the

10  amount of consideration given by STG.  It follows that, STG did not, itself and on its own, clear

11  the title to the property.   Rather, STG used substantial assets of the Bank to cure the

12  unmarketability of the title.   As such, STG failed to meet the second pre-condition to the

13  limitation it is attempting to assert.  Having failed to either clear the title, or move to clear the

14  title using "reasonable diligence" STG cannot assert the limitation in its policy.  Since the Bank's

15  loss and damage fall within the coverage of the policy, and since STG cannot assert that any of

16  its exclusions or limitations apply as a matter of law, the motion to dismiss fails.

### STATEMENT OF FACTS

17

18  **The Andrews Dixon Suit**

19  The Bank was a lender with a deed of trust on certain real property located in Dixon

20  California.  (SAC ¶ 3).  The deed of trust secured a loan in the sum of $10.8 million.  When the

21  borrower defaulted on the loan, the Bank foreclosed on the property and became the owner of the

22  property.  (SAC  ¶ 15).  The Bank was sued by a third party, Andrews Dixon, alleging that its

23  rights under an option agreement and memorandum of option agreement were superior to the

24  Bank's rights under its deed of trust which secured the loan.  (SAC ¶¶ 5-6).

25  **STG Policy**

26  STG's title insurance policy was issued July 17, 2006 when the Bank obtained its deed of

27  trust.  The policy expressly insured the Bank against "loss or damage" sustained or incurred by

28  the Bank by reason of (in pertinent part):

-3-

1    2. Any defect in or lien or encumbrance on the title;

2    3.  Unmarketability of the title;

3    5.  The invalidity or unenforceability of the lien of the insured mortgage upon the title;

4    6.  The priority of any lien or encumbrance over the lien of the insured mortgage;

5    (SAC, Exhibit A, Policy, p1)

6       In insurance parlance this is called the "coverage grant."  The Bank's claim that it

7  incurred a loss and damage as a result of the unmarketability of the title to the property thus fell

8  within the coverage grant of the policy.   (SAC ¶ 33).

9       Notably, the original un-adulterated policy listed the Memorandum of Option Agreement

10  pertaining to the Option Agreement that was the subject of the Andrews Dixon action in

11  Schedule B, Part II.  This is also part of the coverage grant.  Specifically, STG's Policy states

12  that the following encumbrance is "subordinate to the lien or charge of the insured mortgage":

13              THE   TERMS,   CONDITIONS   AND   PROVISIONS   AS
             CONTAINED   IN   THE   AGREEMENT   ENTITLED
14           "MEMORANDUM OF OPTION AGREEMENT", BY AND
             BETWEEN ANDREWS DIXON, LLC, A LIMITED LIABILITY
15           COMPANY, AND R & B LAND INVESTMENTS, LLC, A
             CALIFORNIA LIMITED LIABILITY COMPANY, DATED JULY
16           11, 2006, RECORDED JULY 17, 2006, INSTRUMENT NO. 2006-
             00089600, OFFICIAL RECORDS.
17

18  *Id.*, Exh. A at Schedule B, Part II.[2]

19       The Policy also contains a number of Conditions and Stipulations that are quoted below

20  in the context of the arguments.

21

22

23

24
    _____
25  [2]      A copy of the "Memorandum of Option Agreement" (the "terms, conditions and
    provisions" of which are listed as a "subordinate" encumbrance in the Policy) is contained in
26  Exhibit A of STG's motion (Exhibit F of the Andrews Dixon Complaint attached as Exhibit A of
    STG's motion herein.)   The Memorandum of Option Agreement expressly included "all terms
27  and conditions of the Option Agreement, all of which are incorporated herein by reference as if
    they were fully set forth herein." ¶ 2 of Memorandum.  The Memorandum of Option Agreement
28  was publicly recorded in the official records (Exh. A of SAC at Schedule B, Part II).
                                        -4-
    _____

**STG's Improper Conduct**

The Bank tendered the defense of the Andrews Dixon action to STG.  (SAC ¶ 9).  Instead of diligently handling the defense as it promised to do under the terms of the policy, STG embarked on a confusing, contradictory and reprehensible course of conduct which delayed resolution of the Andrews Dixon action and caused damage to the Bank.  The Second Amended Complaint alleges that initially Stewart improperly altered the policy to try to remove the express coverage its policy provided for the deed of trust's priority over the Option that was the basis of the Andrews Dixon suit. (SAC ¶¶ 6, 9).   STG then agreed to defend the Bank without a reservation of rights in order to insert its panel counsel as defense counsel.  STG's panel counsel, the Bardellini firm, began defending the Bank in March 2008.   After insinuating itself into attorney client privileged communications with the Bank based on its representation it would defend without a reservation of rights, STG reversed course and attempted to re-assert a reservation of rights.  (SAC ¶¶ 11-12).  After the Bank's attorneys' complained of STG reneging on its promise STG *apologized* for its conduct, and represented in a letter dated April 24, 2008 that having conducted its own "independent" review it reconfirmed that it agreed to defend and indemnify the Bank without a reservation of rights. (SAC ¶¶ 13-14).  This fact is omitted from STG's brief.

Unbeknownst to the Bank, STG had again misrepresented its intent to defend the Bank without a reservation of rights. (SAC ¶¶ 18-20, 33, 34, 38).   While fully controlling the defense of the Bank STG began to surreptitiously explore and plot retraction of its waiver of all policy defenses (i.e. defense without a reservation of rights), while contemporaneously having full access to confidential attorney-client privileged communications of the Bank through STG's panel counsel.  (SAC ¶ 21).   After fully controlling the defense for one year, having done virtually nothing to try to bring the Andrews Dixon litigation to a halt, and having done nothing to clear the unmarketability of the title to the Dixon property,  STG once again reneged on its

promises to the Bank and asserted a complete reservation of rights[3] this time filing an unmeritorious declaratory relief action to try to get out of coverage.  (SAC ¶¶ 18-21, 23).

In addition, STG misrepresented the terms of its policy, claiming that the policy was the one it had altered in 2008 which had "erased" the express coverage for the Bank's priority over the subject Memorandum of Option. (SAC ¶ 34)  STG also contended, without any factual support, that STG did not know about the option agreement, even though it had expressly listed the Memorandum of Option Agreement in the policy and specifically insured in the title insurance policy that the Memorandum of Option Agreement was subordinate to the Bank's rights.  (Defendant Exh. E, Geibel letter p1-7; SAC Exh. A at Schedule B, Part II.)

During the full year in which STG completely controlled the defense of the Andrews Dixon action STG made no meaningful investigation, initiated no meaningful discovery and took no action to attempt to mediate, settle or otherwise resolve the case.  STG failed to conduct even the most rudimentary investigation.  For instance, throughout 2008 and 2009, STG failed to obtain a professional appraisal of the property in order to assess the amount of the Bank's loss, or assess the settlement value of the Andrews Dixon Action. (SAC ¶ 23).

STG failed to use reasonable diligence to remove the lis pendens and remove the claims that made the title unmarketable.  (SAC ¶¶ 25, 34).

### Settlement of Andrews Dixon Action

After the Bank gained control of the defense, it steered the Andrews Dixon case toward mediation and resolution. (SAC ¶ 24).  The Andrews Dixon Option Agreement claim was settled with payment by STG _and_ a valuable consideration of the Bank provided through a mutual release between the Bank and Andrews Dixon.  (SAC ¶ 27; Def Exh F (Settlement Agreement),

---

[3]      STG asserts in the "Statement of Facts" section of its motion that STG's March 16, 2009 decision to re-assert policy defenses previously waived was related to the Solano County Superior Court's Order denying the motion to expunge -- which had issued 7 months earlier -- and which STG asserts "conflicted with" the Bank's prior representations concerning its lack of knowledge of the specific contractual provision at issue in the Andrews Dixon litigation. Although this asserted "conflict" has nothing to do with the issues raised by STG's motion, the Bank feels compelled to point out that, in truth, there was no conflict, and the Bank's representations concerning its knowledge were completely accurate.

-6-

¶ 6).  The Andrews Dixon action was finally dismissed January 21, 2010. (SAC ¶ 27).  As part of the settlement the Bank was forced to give up its claims against a third party, Andrews Dixon. (Def Exh F, ¶ 6; SAC ¶ 27).   A mere four days earlier, STG had stated "the Bank holds significant potential counterclaims against Andrews Dixon" and it [STG] believed the Bank "could recover its principal from Andrews Dixon," as well as recover "against Andrews Dixon for fraud in the inducement."  (SAC ¶ 26).

**STG Dismisses Declaratory Relief Action**

STG dismissed its Declaratory Relief action in December 2009 and reimbursed the Bank <u>some</u> of its "Brandt fees" (SAC ¶ 28), *i.e.* fees incurred by the Bank in litigating with STG. ("Brandt fees" is a term used to describe attorney's fees incurred by an insured when the insurance company has acted in bad faith.  *See* footnote 1.)

**Bank's Claim for Loss and Damages**

In early 2008 the Bank received two preliminary offers for the property in the $10.8 million range.  However, because of Andrews Dixon's claims and the lis pendens, the Property was unmarketable and the Bank was unable to proceed with the sale of the property.  (SAC ¶ 16). In May 2008 the property was appraised at a fair market value of $9 million.  (SAC ¶ 17).  By November 25, 2009 the value of the property had dropped to $4.3 million.  (SAC ¶ 29).

The Bank's inability to market the property due to the unmarketability of title caused by the Memorandum of Option Agreement, accompanying Option and resultant lis pendens caused damages to the bank in excess of $8.7 million.  (SAC ¶ 33).

On February 16, 2010 the Bank demanded STG reimburse it $8.7 million for its loss and damage covered under the policy.  (SAC ¶ 30).  On February 27, 2010, STG denied the Bank's claim of loss and damage and refused to pay the Bank any sum under the policy.  STG based its denial on condition/exclusions contained in sections 4(b), 6(b), 8(a) and 8(b) of the policy and its assertion that it had settled the underlying litigation at its "sole expense."  (SAC ¶ 31).

1

**ARGUMENTS**

2     The Second Amended Complaint sufficiently alleges facts to support its causes of action

3 for Breach of Contract and Tortious Breach of the Implied Covenant of Good Faith and Fair

4 Dealing.  STG's motion fails to prove that its policy does not cover the Bank's claim for loss and

5 damages.  The arguments and case law cited by STG do not support dismissal of the Banks'

6 claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

7 Since STG has failed to carry its burden, its Motion to Dismiss should be denied.

8

**A.   This Is Not an "Extraordinary" Case Warranting any Dismissal under Rule**
9     **12(b)(6).**

10     On a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the allegations

11 of the complaint as true.  *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  The Court must also give the

12 plaintiff the benefit of every reasonable inference to be drawn from the well-pleaded allegations

13 of the complaint.  *Retail Clerks Int'l Ass'n v. Schermerhorn*, 373 U.S. 746, 753 n.6 (1963).  A

14 plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from

15 facts properly alleged.  *Id.*

16     The Supreme Court recently admonished that a court may not dismiss a complaint in

17 which the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its

18 face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 (2007).  This Court may grant a

19 motion to dismiss a claim "only if it is clear that no relief could be granted under any set of facts

20 that could be proved consistent with the allegations."  *Swierkiewicz v. Sorema N.A.*, 534 U.S.

21 506, 514 (2002) (internal quotation marks and citation omitted).

22     Given these rigid standards, and the liberal pleading standards under Rule 8, the Ninth

23 Circuit has repeatedly counseled districts courts:  "'It is axiomatic that the motion to dismiss for

24 failure to state a claim is viewed with disfavor and is rarely granted.'"  *Gilligan v. Jamco*

25 *Develop. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (quoting *Hall v. City of Santa Barbara*, 833

26 F.2d 1270, 1274 (9th Cir. 1986)) (internal quotation marks and brackets omitted).  "Under [Rule

27 8] it is only the extraordinary case in which dismissal is proper."  *United States v. City of*

28 *Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

-8-

1    STG has not shown that this is the extraordinary case in which any cause of action should

2    be dismissed for failure to state a claim.  As shown below, each element of the Bank's claims for

3    breach of contract and breach of the implied covenant of good faith and fair dealing (a contract,

4    performance, breach, and damages) has been alleged.  Therefore, the Court should deny STG's

5    motion in its entirety.

6    **B.  The Bank Has Sufficiently Pled It Suffered Loss and Damage Covered by the
7    Policy.**

8    STG's motion rests on its assumption that the policy does not cover the Bank's claim for

9    loss and damages under the policy.  That assumption is wrong.  The Bank pled that it suffered

10   substantial loss and damage as a result of Andrews Dixon's challenge to the priority of the

11   Bank's Deed of Trust – in other words a claim adverse to the Bank's interest in the title.

12   Andrews Dixon alleged that its rights under an option agreement were superior to the Bank's

13   rights under its deed of trust which secured the loan.  (SAC ¶¶ 5-6). The option agreement was

14   incorporated in a Memorandum of Option Agreement which pre-existed the Policy and was

15   listed in the Title Insurance Policy issued by STG.  SAC, Exh. A at Schedule B, Part II.

16   Andrews Dixon's claim alleged an encumbrance or cloud on the title to the property that if

17   proven rendered the Bank's interest in the property worthless.  The property that secured the

18   Bank's loan would belong to Andrews Dixon, and the Bank would in effect have an outstanding

19   loan with no security.  After the borrower defaulted, the Bank foreclosed and acquired title to the

20   property.  However, the Option, and Memorandum of Option Agreement upon which Andrews

21   Dixon's claim was based directly challenged the Bank's title in the property and rendered the

22   Bank's property unmarketable. When the Bank received promising offers to sell the property for

23   $10.8 million, it was unable to proceed with the sale, because the Option and Memorandum of

24   Option Agreement under which Andrews Dixon claimed a right to the property had rendered the

25   Bank's title unmarketable…a risk expressly covered by the STG Title Insurance Policy.

26   *Lick Mill Creek Apartments v. Chi. Title Ins. Co.*, 231 Cal. App. 3d 1654 (1991), cited by

27   STG for the proposition that defects which impair the market value of the property rather than

28   the marketability of the title to the land do not constitute a compensable loss under a title

-9-

1   insurance policy, does not help STG.  The court simply ruled that the presence of hazardous

2   substances did not affect the *marketability of title*, but only the property's market value.  That is

3   markedly different than here, where the Andrews Dixon claim under the Option Agreement

4   directly affected the Bank's title to the property, and made the title unmarketable.

5        STG next argues that the *lis pendens* filed by Andrews Dixon was a post-policy event and

6   thus cannot be covered by the policy.  But STG's argument sidesteps the real issue:  that the

7   Option Agreement and the Memorandum of Option Agreement both of which pre-existed the

8   issuance of the policy caused an encumbrance on the Bank's title and made the property

9   unmarketable. STG seems to understand this distinction but relegates it to a footnote when it

10  states in Footnote 8: "See also Alice L. Akawi, et al., California Title Insurance Practice § 6.44

11  (CEB 2d ed. 2009 update) (noting that while the claims underlying a lis pendens could fall under

12  policy coverage, the post-policy lis pendens itself does not)."  Here, the claims underlying the lis

13  pendens are based on the Option Agreement and the Memorandum of Option Agreement that

14  pre-existed the Policy and render the Bank's title unmarketable.  In California Title Insurance

15  Practice § 6.44 cited by STG, Alice L. Akawi explains "If a claim is denied as a post-policy

16  matter the practitioner should examine the underlying basis of the claim carefully to determine

17  whether it is based on a covered pre-policy interest or defect in title for which there is coverage."

18  The Andrews Dixon claim is such a claim: it is based on the pre-policy Option Agreement and

19  Memorandum of Option Agreement which falls within the covered risks of the STG Title Policy.

20  *Safeco Title Ins. Co. v. Moskopoulos*, 116 Cal. App. 3d 658, 666 (1981), cited by STG, is off-

21  point, because in that case there never was an attack on the "title" to the property. ("There is not

22  a suggestion in the record or the briefs of any matter constituting a defect in or lien or

23  encumbrance on the record title…"  *Id*. at 666.)  Under those circumstances the post-policy lis

24  pendens relating to the alleged misconduct of the insured was obviously not covered.

25        The coverage grant of the STG policy enumerates the many covered risks insured by

26  STG.  It insures the Bank (in pertinent part) against "loss or damage…sustained or incurred by

27  the insured by reason of:

28        2.  Any defect in or lien or encumbrance on the title;

-10-

3.  Unmarketability of the title;

5.  The invalidity or unenforceability of the lien of the insured mortgage upon the title;

6.  The priority of any lien or encumbrance over the lien of the insured mortgage;

(SAC, Exh A (Policy), p1)

In California coverage under an insurance policy is interpreted broadly.  The California Supreme Court has held "Moreover insurance coverage is 'interpreted broadly so as to afford the greatest possible protection to the insured, [whereas] ... exclusionary clauses are interpreted narrowly against the insurer.'" *White v. Western Title Ins. Co.*, 40 Cal. 3d 870, 881 (1985).

The Bank's claim for damages falls plainly within the covered risks enumerated in the coverage grant.  The Andrews Dixon claim attempted to establish the priority of the Option Agreement and Memorandum of Option Agreement over the Bank's deed of trust and title to the property.   STG expressly insured that the Bank's interest in the property would have priority over the Memorandum of Option Agreement.   Exh. A at Schedule B, Part II.   Andrews Dixon's claim that the Option Agreement and Memorandum of Option Agreement had priority over the Bank's title, made the Bank's title unmarketable …which claim falls within item 3 of the covered risks.  Since the Bank has alleged facts that show that it was unable to market the property, the Second Amended Complaint alleges sufficient facts to show that the Bank's claim falls within the coverage grant of the policy.  Moreover the damages alleged by the Bank flow from Andrews Dixon's claims based on the Option Agreement and Memorandum of Option Agreement that pre-dated the policy, and from the unmarketability of the Bank's title which prevented it from accepting bona fide offers and consummating a sale of the property in early 2008.

### C.  The Policy Limitations Cited By STG Do Not Apply

STG next attempts to argue that the Conditions and Limitations ended its duty to pay the Bank for its loss and damage.  But since the coverage flows from the coverage grant and STG cannot prove that its exclusions and limitations defeat coverage, the Bank has properly stated causes of action for Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing.

STG first contends that under section 8(b) [4] of the Conditions and Stipulations, STG has no liability until there has been a final determination of the Andrews Dixon action, and that since the action was settled there can *never* be a final determination.   STG attempts to sidestep the requirement in section 8 (a) of the Conditions and Stipulations that it use *reasonable diligence* to remove the alleged defect, or encumbrance or cure the claim of unmarketability of title, by arguing that section 8(a) does not "create liability that does not otherwise exist" because it is a limitation.  By creating a straw argument, STG misses the point.

The Bank does not argue that a Limitation on coverage creates liability.  The liability of STG was triggered when the Bank's loss from the unmarketability of its title fell within the coverage risks set forth in the coverage grant as discussed in detail above in Section B.  STG insured the Bank against "loss or damage…sustained or incurred …  by reason of…the Unmarketability of the title."

Moreover, STG attempts to assert the Limitation in section 8(b) by reading it in isolation as though it had no context, and ignoring the provisions of sections 4(a) and (b) and 8(a), all of which contain reasonable diligence requirements.  As discussed below, STG's forced interpretation eviscerates section 8(a) and renders it meaningless.

**1. STG Has the Burden of Proving Its Exceptions to Coverage Apply**

The California Supreme Court held "The *burden* is on the insured to establish that the claim is within the basic scope of coverage and *on the insurer to establish that the claim is*

---

[4] Policy, at 4 ("[Section] 8. LIMITATION OF LIABILITY.

 (a) If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured, *in a reasonably diligent manner* by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.") (Emphasis added).

 (b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage as insured.")

*specifically excluded*." *Aydin Corp. v. First State Ins. Co*., 18 Cal. 4th 1183, 1188 (1998) (emphasis added).

In *Gray v. Zurich*, 65 Cal. 2d 263, 269 (1966), the California Supreme Court held hat any ambiguity in an insurance policy is construed against the insurance company:

> It is elementary in insurance law that any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer … If the insurer uses language which is uncertain any reasonable doubt will be resolved against it…

"[A]n insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear...Thus, *'the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language*.' [Citation.] The exclusionary clause *'must be conspicuous, plain and clear*.' *(State Farm Mut. Auto Ins. Co. v. Jacober* (1973) 10 Cal.3d 193, 201.)" *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 648 (2003). The burden applies to any exception to coverage, including the limitations in STG's policy.

### 2. STG is Unable to Prove As a Matter of Law That It has Met the Elements Required to Assert Its Exclusion

STG contends that it resolved the Andrews Dixon claim favorably and therefore section 8(b) "together with the rest of the Policy precludes the Bank's claims." We anticipate STG will attempt in its Reply to avail itself of policy language in section 8(a) which provides that if STG "cures the claim of unmarketability of title" or otherwise establishes the priority of the Bank's deed of trust in a "reasonably diligent manner by any method" "it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby."

STG's contention fails because the factual allegations of the SAC allege STG has failed to meet two elements necessary for the assertion of its exclusion or limitation. First, STG did not "establish" the title or "cure the claim of unmarketability," because the settlement of the Andrews Dixon action which STG negotiated required the Bank to give up valuable consideration.

Second, STG did not distinguish itself in the handling of the claim, and the evidence weighs heavily against STG's assertion that it acted in a "reasonably diligent manner." If the

-13-

1   trier of fact finds STG failed to act in a reasonably diligent manner, it has not met one of the

2   conditions of its exclusion, and its exclusion does not apply.

3        **3. The Bank Provided Substantial Consideration for the Settlement of the Andrews Dixon
        Action In Order To Make the Title Marketable**

4

5       STG cleverly implies that only STG paid consideration for the settlement of the Andrew

6   Dixon action by stating that only STG paid "money" in the settlement.  But STG omits to state

7   that the Complaint alleges that the Bank released Andrews Dixon as part of the consideration for

8   the settlement.  It also fails to state that four days prior to the settlement, STG had opined that

9   "the Bank holds significant potential counterclaims against Andrews Dixon" and it believed the

10   Bank "*could recover its principal* from Andrews Dixon," as well as recover "against Andrews

11   Dixon for fraud in the inducement."   (SAC ¶ 26, emphasis added).  Since the original principal

12   on the Bank's loan was $10.8 million, the amount of consideration given by the Bank as part of

13   the mutual release in the settlement with Andrew Dixon was five-fold the amount of

14   consideration given by STG.

15        **4.  Limitations in Section 8 are meant to Be Read Together, Not in Isolation**

16       STG's contention that section 8(b) should be read in isolation and apart from the reasonable

17   diligence requirement of section 8(a) would lead to absurd results that render section 8(a)

18   meaningless.  (see Footnote 4 for text of section 8).  If STG clears the title through litigation,

19   then section 8(a) insulates STG from liability *only* if it acted with reasonable diligence.  If it does

20   not act with reasonable diligence STG would be potentially liable for loss and damage suffered

21   by the insured.  But under STG's strained interpretation of section 8(b), STG could completely

22   avoid the potential liability left open by section 8(a) simply by settling a case that was going

23   badly at the eleventh hour even if it had acted in a manner completely devoid of reasonable

24   diligence.  Thus, under STG's interpretation, if damages continued to mount while it failed to act

25   with reasonable diligence, it could escape the requirements of section 8(a) (that liability

26   terminates only if the insurer acted in a reasonably diligent manner") by simply settling the case

27   on appeal, or even after losing an appeal before the decision became "final."  No final judgment,

28   no liability – or so argues STG.  This would gut any reason to have section 8(a) in the policy,

because liability could be avoided easily and in a very artificial manner.  Obviously section 8(a) and 8(b) are meant to be read together and not in isolation.

Exceptions and Exclusions are interpreted narrowly against the insurer.  Thus, when read in the context of section 8(a) and other provision of the policy, the only reasonable interpretation of section 8(b) is that STG is not liable for losses and damages under the policy until the underlying title defect dispute has reached finality, either through judgment or final settlement.

**5.  Reasonable Diligence is Required and is a Question of Fact**

STG also neglects to point out that section 4 of the Conditions and Stipulations requires STG to provide a defense "*without unreasonable delay*…" (Emphasis added).  If STG prosecutes a suit or "does any other act which in its opinion may be necessary or desirable to establish the title"… "to prevent or reduce loss or damage to the insured"… " [STG] shall do so *diligently*." (SAC, Exh. A at 3 (section 4(a) and (b)) emphasis added.)  Thus, contrary to its contention, the policy imposes a duty upon STG to act *diligently* and defend the suit *without unreasonable delay*.

The diligence requirement is again emphasized in section 8(a) of the policy.  This section provides that STG can terminate its liability under the policy if it establishes the title or removes the alleged defect or encumbrance or cures the claim of unmarketability of title so long as it does so "in a *reasonably diligent manner.*"  To avail itself of this provision, *STG* must prove that it acted in a reasonably diligent manner.  In *Nebo Inc. v. Transamerica Title Insurance Co*., 21 Cal. App. 3d 222 (1971), a case involving coverage under a title insurance policy, the court held "What constitutes a reasonable time is a *question of fact*, depending upon the situation of the parties, the nature of the transaction, and the facts of the particular case." (*Id*. at 228, emphasis added.)  Since sufficient facts have been pled to raise the issue of whether STG acted diligently, "reasonable diligence" is a question of fact that cannot be resolved without a trial.

Other jurisdictions have considered similar provisions and have sided with the reasoning of the court in *Nebo*.  In *Hatch v. First American Title Insurance Company*, 895 F. Supp. 10 (D.Mass. 1995), even after the insurer established title the court held the insured could recover damages under the policy if it showed the title insurer had failed to act diligently.  Citing *Nebo,*

-15-

1    *Inc. v. Transamerica*, the court held that "[w]hether First American cured the defect within a

2    reasonable time is a question of fact."  895 F. Supp. at 13.

3              In *Cocoa Properties, Inc. v. Commonwealth Land Title Insurance Company*, 590 So. 2d

4    989, 991 (Fla. App. 1991), the court, analyzing similar policy language, also found the issue of

5    reasonable diligence was a *question of fact* to be determined by the trier of fact:

6              Since the question of reasonable time is a question of fact which depends upon the
              situation of the parties, the nature of the transaction, and the facts of the particular case, see
7              *Nebo*, a material issue of fact remains in this matter.

8              Since the question of whether STG acted in a reasonably diligent manner is a question of

9    fact, STG's motion to dismiss should be denied.

10             STG argues that under the Bank's theory the court would be required to speculate as to

11   whether the settlement offer could or should have been made or accepted sooner and whether

12   motions could have been filed earlier and whether discovery could have been taken earlier in

13   order to determine whether STG acted with reasonable diligence.  (Def. Brief p.18).  But, STG

14   would have the court ignore and write out of the policy "reasonable diligence" requirements it

15   inserted in three provisions of the policy.  It is not the court's role to rewrite the policy.  *Rosen v.*

16   *State Farm General Ins. Co.*, 30 Cal. 4th 1070, 1073 (2003).  In *Nebo*, *Hatch* and *Cocoa*

17   *Properties* the courts had no problem having the trier of fact determine if the title insurance

18   company had acted with reasonable diligence.  Furthermore, STG misunderstands the standard

19   required for it to impose its Limitation.  The trier of fact need not weigh the precise degree that

20   STG's lack of diligence impacted the loss of the Bank.  So long as it finds STG failed to act in a

21   diligent manner, there is a failure of condition and the Limitation in section 8(b) does not apply.

22             STG argues that it is not liable for legal malpractice of its attorneys.  The Bank has not

23   alleged attorney malpractice.  The allegations against STG deal with its breach of duty to defend

24   and investigate, its failure to provide independent counsel as required by law, its

25   misrepresentations as to the policy terms and its coverage position, its improper insinuation into

26   attorney-client privileged communications, and its improper altering of the policy to remove the

27   reference to the Memorandum of Option.  In short, STG's almost complete focus on improperly

28

-16-

1    trying to extricate itself from its policy obligations to the detriment of using reasonable diligence

2    to cure the unmarketability of title.

3    **6. Section 8 (b) Does Not Terminate STG's Coverage Under the Facts Alleged**

4        STG makes the bold but factually incorrect statement that it "successfully resolved the alleged

5    encumbrance through litigation."  It argues that as a result it has no further liability because of

6    the Limitation in section 8(b) of the policy.   STG contends that if a case is settled, even with the

7    insured's consideration, the insured cannot recover its loss and damage under the policy.   It

8    argues that unless there is a "final adverse determination by the Andrews Dixon Court" (which of

9    course can never happen since STG settled the case) there can be no liability.  (Def. Brief p. 16).

10        First, the Andrews Dixon action was resolved by settlement, not by "litigation."   As

11   discussed above, STG's interpretation would gut the purpose behind section 8(a) and render it

12   meaningless.  Second, as noted above, the consideration for the settlement was largely provided

13   by the Bank itself when, pursuant to the settlement negotiated by STG, it released Andrews

14   Dixon.  Four days prior to the settlement STG stated in writing that the Bank's cross-claim

15   against Andrews Dixon could recover the $10.8 million principle the Bank had loaned in the load

16   secured by the deed of trust.  The policy itself states in section 6(b)[5] that STG must pay the

17   settlement in order to terminate its liability.  Thus, to avail itself of section 8(b), STG must itself

18   have cured the claim of unmarketability. It cannot terminate its obligations by having the insured

19   provide the major portion of the consideration given in exchange of the settlement that clears the

20   title.

21        Moreover, even without the issue of who paid the "consideration" for the settlement, case

22   law does not support STG's position as to its interpretation of section 8 (b).

23        In *Nebo Inc. v. Transamerica Title Insurance Co*., 21 Cal.App.3d 222, 228 (1971), the

24   insured, Nebo, demanded that Transamerica clear the title to four lots insured under a title policy.

25

26   _____

27   [5] Policy, at 3 (Conds. & Stips. § 6 (b)) ("Upon the exercise by the Company of either of the
     options provided for in paragraphs a (i) or (ii) [to pay or otherwise settle with other parties for or

28   in the name of an insured claimant any claim insured against under the policy], the Company's
     obligations to the insured under this policy for the claimed loss or damage …shall terminate.")

-17-

1   Transamerica filed a quiet title action and focused its efforts on another action which it believed

2   raised identical issues.  After it lost the other action, it turned to the insured's case.  Instead of

3   litigating to a final court determination, Transamerica settled the case with the defendants and

4   delivered clear title to Nebo.  Nebo still sought lost rents he had suffered as a result of the alleged

5   defect in his title, and alleged Transamerica had failed to resolve the case within a reasonable

6   time.  The court affirmed the judgment in favor of Nebo and against Transamerica.  It held the

7   issue of whether Transamerica had cleared title within a reasonable time was a question of fact.

8   *Id* at 228.  The court held (at pages 228-229):

9   
10          Moreover, Transamerica did not perfect Nebo's title through litigation. The company
           gambled on litigation and lost, finally acquiring good title by purchase. But the title
11          Transamerica acquired and later conveyed to Nebo was not the title Nebo had bargained
           for in the exchange transaction and which Transamerica, with full knowledge of the facts
           and in its own self-interest, undertook to insure. The title finally furnished did not carry
12          with it the right to collect rents from the close of escrow. The contention Transamerica
           fulfilled its obligation under the title policy by finally furnishing title three years, four
13          months and eighteen days after the close of escrow is without merit.

14          The fact that Transamerica had settled the underlying case rather than obtained a

15   judgment was important to the court's rejection of the appeal.  This is a distinction which cases

16   in other jurisdictions have also thought was important when deciding the insured could pursue a

17   remedy even if there was no adverse court ruling on the title.

18          STG argues *Nebo* is not controlling because the clause in that policy was slightly

19   different than section 8(b) because the STG policy in that the Nebo policy contained a

20   "reasonable time" requirement in the same paragraph that terminated liability.   In other words,

21   STG attempts to separate sub-section 8(a) which has a "reasonable diligent manner" requirement

22   from the context of sub-section 8(b) even though they are under the same heading for section 8.

23   Limitation of Liability.  This argument is dubious at best.  It becomes even more strained when

24   one notes that the conditions in section 4(a) and (b) in the policy require STG to act *diligently*

25   when doing any act to establish the title and defend the suit *without unreasonable delay*.  These

26   conditions to act "diligently" and "without unreasonable delay" are embedded as a condition and

27   stipulation to all other parts of the policy including section 8(b) which STG attempts to extricate

28   into an island on to itself.   Moreover, in this context a reasonable reading of the policy also

-18-

1  incorporates section 8(a)'s requirement that STG act in a "reasonably diligent manner" to cure

2  the claim of unmarketability of title before it can terminate its liability.

3        In *Hatch v. First American Title Insurance Co.*, 895 F. Supp. 10 (D.Mass. 1995), a case

4  with similar policy language as the STG policy, the court reconciled subparagraphs (a) and (b)

5  and rejected the position STG puts forward.  The insureds (a husband and wife) terminated a

6  land-sale contract after being notified of a defect in their title. They had bought another home in

7  anticipation of the sale of the property. They notified the title company that insured them that

8  their property was unmarketable. After the Land Court entered judgment establishing the

9  Hatches' title to the property, they sold the property for $22,000 less than the original contract.

10  They demanded the title insurance company reimburse them for the loss of value of the insured

11  property and $20,000 for interest paid on a loan on the other home they had bought.  The policy

12  had a similar provision as section 8(a) and (b) of the STG policy.  It provided (at pages 11-12):

> No claim shall arise or be maintainable under this policy (a) if the Company, after having received notice of an alleged defect, lien or encumbrance insured against hereunder, by litigation or otherwise, removes such defect, lien or encumbrance or establishes the title, as insured, within a *reasonable time* after receipt of such notice; (b) in the event of litigation until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to title, as insured, as provided in paragraph 3 hereof …

18        Similar to STG's contention here, First American contended that because it undertook

19  litigation to cure title in the property, and because that litigation did not result in a final judgment

20  adverse to title, subsection (b) precluded the Hatches' claim.[6]  The Court rejected the position of

21  First American.  It noted that the policy language "provides, in effect, that no claim shall arise

22  under the policy (a) if any defect is cleared by litigation within a reasonable time; or (b) if any

23  defect is cleared by litigation, ever."  The court noted that while "the two provisions are not

24  literally contradictory.  Neither, however, are they absolutely compatible." *Id.* at p. 12.

---

[6] It is important to note that unlike in the *Hatch* case, STG never obtained a favorable ruling from the court establishing the Bank's title.

1   The court found the policy language was ambiguous because "the first provision implies

2   what the second precludes: that an insurer must reasonably litigate any lawsuit which it

3   undertakes on behalf of the insured."   It concluded that since ambiguities are construed against

4   the insurer the Hatches may prevail on their claim if they demonstrate that First American failed

5   to cure the title defect within a reasonable time.   Citing *Nebo, Inc. v. Transamerica*, the court

6   held that "Whether First American cured the defect within a reasonable time is a question of

7   fact." *Id* at p. 13.

8       In *Cocoa Properties, Inc. v. Commonwealth Land Title Insurance Co.*, 590 So. 2d 989

9   (Fla. App. 1991), another case with similar policy language and not discussed by STG, the court

10  also held that the issue of whether the title company acted with reasonable diligence was a

11  question of fact.   Cocoa Properties was not able to close on a contract for sale because of an

12  adverse claim to the property.   It claimed the property was unmarketable from late June 1987

13  until late August 1989.   The sale would have provided Cocoa Properties with a profit, but instead

14  it sold the property at a loss.   The title company defended the action, and pursuant to a settlement

15  agreement allowed the mortgage holder to obtain judgment, and assign the judgment back to a

16  subsidiary of the title company.   The title company restored clear title to the Cocoa Properties

17  and, much like STG here, asserted it had no further obligation under the policy.

18      The court rejected the argument and noted that the title company, Commonwealth, "did

19  not receive a favorable ruling in the foreclosure action and, accordingly, did not perfect title

20  through litigation."   The court reasoned (at page 991) that since title had been cleared through

21  settlement, provisions of paragraph 7(b), (similar to section 8(b) in the STG policy), did not

22  prevent recovery by the insured for its loss and damage:

> Commonwealth gambled on litigation and, after losing in the trial court, finally cleared the title through a purchase. Because the foreclosure action in the trial court was voluntarily dismissed, there was no final determination, either adverse or favorable, concerning the title. The trial court, therefore, erred in holding that paragraph 7(b) of the policy prevented recovery in this matter. See *Nebo, Inc. v. Transamerica Title Ins. Co*., 21 Cal. App. 3d 222, 98 Cal. Rptr. 237 (Cal. Dist. Ct. App. 1971).

27      Similarly, STG never obtained a favorable ruling in the Andrews Dixon action. It settled

28  the case after the trial court issued an adverse ruling on the Motion to Expunge the lis pendens.

-20-

1   STG never established title through litigation.  The Bank's title was established by way of a

2   settlement with Andrews Dixon. (SAC ¶ 27). Thus, consistent with the holdings in *Nebo, Inc. v.*

3   *Transamerica Title Ins. Co.*, *Cocoa Properties, Inc. v. Commonwealth Land Title Insurance*

4   *Company,* and *Hatch v. First American Title Insurance Company*, the Bank can recover its loss

5   and damage if STG is unable to prove that it acted in a reasonably diligent manner.

6          The *Cocoa Properties, Inc. v. Commonwealth Land Title Insurance Company* decision

7   limited the holding in *Lawyers Title Ins. Co. v. Synergism One Corp.*, 572 So. 2d 517, 518 (Fla.

8   Ct. App. 1990), which is relied upon by STG, to situations where the insurer actually obtains

9   court rulings establishing the title – something STG never did.  In *Lawyers Title Ins. Co.*, the title

10  company won at trial.  (It sued to eject the farmer and won the case. The farmer appealed the trial

11  court ruling, and the title company settled with him while on appeal). Similarly in *First Federal*

12  *Savings Bank of Brunswick v. Stewart Title Guaranty Co.*, 451 S.E. 2d 916, 917 (S.C. Ct. App.

13  1994), another case STG cites in support of its motion, the insurer (Stewart Title) cleared title

14  through litigation, obtaining a favorable order that reformed the deeds in question to reflect the

15  owners held fee simple titles to their condominiums.   The same was true in the *RTC Mortgage*

16  *Trust 1994 N-1 v. Fidelity National Title Ins. Co.*, 58 F. Supp. 2d 503, 533 (D.N.J. 1999), cited

17  by STG.   After lengthy bankruptcy proceedings and appeals involving the Resolution Trust

18  Corporation  during  the  Savings  &  Loan  crisis,  USA  Title  obtained  a  final  court  ruling

19  establishing the priority of the insured's mortgage.   In all three decisions cited by STG, the

20  Limitation clause was used to terminate liability after the insurer had cleared title with favorable

21  rulings through litigation.

22          In the case herein, STG did not obtain a favorable ruling in litigation that cleared the

23  defect that made the Bank's title unmarketable.  Instead, after adverse rulings it settled the case

24  with Andrews Dixon using partly its money and partly the release of the Bank's chose in action

25  against Andrews Dixon as consideration.   Thus, unlike the title companies in the cases it cites

26  (*Lawyers Title Ins. Co. v. Synergism One Corp.*; *First Federal Savings Bank of Brunswick v.*

27  *Stewart Title Guaranty Co.*, and *RTC Mortgage Trust 1994 N-1 v. Fidelity National Title Ins.*

28  *Co.*), STG here did not obtain a favorable court ruling that established title and allow it to assert

-21-

the provisions of section 8(b).[7]  Nor, according to the allegations of the SAC, did STG act with reasonable diligence as is required by section 4(a) and (b) of the policy.  Having suffered setbacks in the litigation, it chose to settle with Andrews Dixon, thereby making this case more like the situations in *Nebo, Inc. v. Transamerica Title Ins. Co.*; *Cocoa Properties, Inc. v. Commonwealth Land Title Insurance Company*; and *Hatch v. First American Title Insurance Company*, all of which permitted the insured to recover loss even though there had been no adverse final judgment on the title.

STG quotes *Continental Ins. Co. v. Superior Court*, 37 Cal. App. 4th 69, 85 n.11 (1995), a case involving a Directors & Officers policy, to support its position that reasonable diligence is not an issue.  In doing so, STG attempts to borrow a concept from the law of bad faith (exposing the insured to a judgment in excess of policy limits) and insert it, out of context, to interpret express contractual policy provisions of the policy.   Here, the Bank's loss and damages fall within the coverage grant of the policy (damages incurred by reason of the unmarketability of title).  STG attempts to limit liability for the coverage by way of an exclusion (section 8 (b)).  STG has the burden of proving its Limitation (exclusion) applies.  To do so, the conditions of the policy require STG to prove it acted in a reasonably diligent manner.

### D. The Bank's Loss Was Caused By The Unmarketability of its Title Due to the Option Agreement and Memorandum of Option Agreement

The Bank's loss and damage were directly related to the defect in priority of its lien caused by the Option Agreement and Memorandum of Option Agreement which pre-date the policy.

STG argues that the policy does not cover "bad investment judgment" and that title insurance "is not a guarantee of the value of the property."  No one argues with that; and it has nothing to do with the Bank's claim.  STG cites *Safeco Ins. Co. of Am. v. J & D Painting*, 17 Cal. App. 4th 1199, 1204 (1993), for the proposition that diminution in market value is not

---

[7] The Bank's Motion to Expunge the lis pendens was denied by the trial court.  Def Brief p. 6 While it is true that the Boutin firm filed the motion, the rest of the motion and arguments were handled by the Bardellini firm, STG's panel counsel. (SAC ¶¶ 10, 11 & 18).

recoverable under a title insurance policy.  But *Safeco. Ins. Co.* says no such thing. The case involved a homeowner's action against a painting company who had caused fire damage to his home. Safeco paid the cost of repair.  But the homeowner pursued the painting contractor for damages to compensate him for the steep decline in market value that his house suffered during the five months that it was being repaired.   The court dispensed with the claim against the painting contractor based on principles of "proximate cause." *Id.* at 1204-06.  The case has nothing to do with amounts recoverable under a title insurance policy that expressly insures for loss and damage incurred due to the unmarketability of title.

STG insured that the Bank's deed of trust had priority over the Memorandum of Option Agreement and Option Agreement.  The STG policy, like most standard title policies, insures a number of risks.  One of those covered risks is for loss or damage incurred by the insured by reason of "unmarketability of the title."  STG never obtained a court ruling establishing the priority of the Bank's deed of trust. The Andrews Dixon action had to be settled and consideration had to be paid to Andrews Dixon in order to dispense with the Option Agreement and Memorandum of Option Agreement.  The Complaint alleges that in early 2008 the Bank received a number of offers to purchase the property in the $10.8 million, however because of the Option claims asserted by Andrews Dixon, it was unable to proceed with the sale of the property. (SAC ¶ 16). The Complaint also alleges that the property was appraised as having a fair market value of $9 million in May 2008, which is near the time of the foreclosure under which the Bank assumed title to the property.  (SAC ¶17).  By the time the Bank's priority and free title was restored the fair market value, according to a certified appraisal, had dropped to $4.3 million. (SAC ¶¶ 29-30).

Since the Bank was forced to pass up good offers to sell the property for $10.8 million due to the unmarketability of its title, the loss and damage alleged in the complaint is precisely the type of loss and damage covered by the policy.  The type of loss alleged by the Bank is the same as the damages alleged in *Hatch v. First American Title Insurance Co.*, 895 F. Supp. 10 (D.Mass. 1995).  In that case, the insureds had to terminate his land sale contract due to the

1   unmarketability of title.  By the time, their title had been established they sold the property for

2   $22,000 less than the original contract price – a drop in market price.

3        The Bank's claim is also much like the one in *Cocoa Properties, Inc. v. Commonwealth*

4   *Land Title Insurance Co.*, 590 So. 2d 989 (Fla. Ct. App. 1991).  Cocoa Properties was not able to

5   close on a contract for sale because of an adverse claim to the property and claimed the property

6   was unmarketable from late June 1987 until late August 1989 (a period similar to the one alleged

7   in the Bank's complaint herein).  The appellate court overturned the summary judgment and

8   allowed Cocoa Properties to pursue recovery of its lost profit resulting from the market drop

9   during the time the property was unmarketable.  *Id.* at 990.

10        The Bank is not suing STG because of a guarantee of the value of the property or bad

11   investment judgment, as STG curiously suggests.  It is suing for damages directly related to the

12   "unmarketability of title" resulting from the Option Agreement and Memorandum of Option

13   Agreement…a risk expressly covered by the policy. The Bank is also entitled to recover the

14   significant costs it incurred in property taxes and appraisals it was required to undertake.   If it

15   had been able to sell the property when it wanted in early 2008, it would never have suffered the

16   loss attributable to the property taxes and appraisals incurred and paid after that time.  These too

17   were losses and damages directly attributable to the unmarketability of title.  The bank also

18   would have earned interest on proceeds from the sale if the sale had not been prevented by the

19   unmarketability of title.

20   **E. The Complaint Alleges Substantial Evidence of Bad Faith Conduct of STG**

21        In footnote 3 of its brief, STG attempts to minimize its outrageous conduct in altering the

22   policy by making the remarkable assertion that "the relevant Policy provisions are the same in

23   both versions of the Policy."  The altered policy removed the express language that listed the

24   relevant Memorandum of Option Agreement as an item that STG expressly insured the Bank's

25   title would have priority over.  Thus, to state that both versions of the policy are the same is a

26   stretch.

27        STG filed its declaratory relief action asserting the actual notice exclusion, which it had

28   waived in prior letters to the Bank, and again waived since settlement of the Andrews Dixon

1  action. (SAC ¶¶ 10, 14, 28).   The actual notice exclusion requires that the defects and

2  encumbrances adverse to the title, first, not be known to STG on the Date of the Policy, and,

3  second, be known to the insured and not disclosed prior to the date of the policy.  (Policy p2,

4  Exclusion 3).   STG based its declaratory relief action on this actual notice exclusion thus

5  necessarily asserting it did not have knowledge of the Option Agreement and Memorandum of

6  Option Agreement at the time it issued the policy.  What is astonishing is that STG did so even

7  though it listed the Memorandum of Option Agreement (which incorporated the Option

8  Agreement) in Schedule B, Part II of its original policy.  The insurer also breaches this implied

9  policy covenant when it files a declaratory relief action regarding coverage for reasons indicating

10  bad faith, for example where there is no proper cause to dispute coverage and where the insurer

11  urges a willfully misguided interpretation of the policy.  *Dalrymple v. United Service Auto.*

12  *Ass'n*, 40 Cal. App. 4th 497, 515 (1995).  STG's declaratory relief is therefore bad faith as a

13  matter of law.

14  　　 The other bad faith conduct of STG is recited throughout the SAC and on pages 4-6 of

15  this brief. To avoid redundancy we do not repeat those allegations here.

16  　　 An insurer breaches the covenant of good faith and fair dealing implied in every

17  insurance policy "when it fails to properly investigate its insured's claim."  *McCoy v.*

18  *Progressive West Ins. Co.*, 171 Cal. App. 4th 785 (2009) (internal quotation marks and citation

19  omitted).  The SAC alleges a failure to investigate.

20  　　 Under California law, when the insurer and the policyholder have divergent interests on

21  an issue which will be litigated in the tendered suit and which may also affect the policyholder's

22  right to coverage under the policy the policyholder is entitled to choose his/its defense counsel

23  and control the defense.  *San Diego Federal Credit Union v. Cumis Ins. Society, Inc.*, 162 Cal.

24  App. 3d 358 (1984).  California Civil Code Section 2860 has been deemed a codification of the

25  "the principles enunciated in *Cumis*."  *Mosier v. Southern California Physicians Insurance*

26  *Exchange*, 63 Cal. App. 4th 1022, 1042 (1998).  The right to an unconflicted defense is deemed

27  so important that even where the insurer provides a "courtesy defense" to a party who is not an

28  insured, the insurer is required to pay for independent counsel. *Mosier v. Southern California*

-25-

1   *Physicians Insurance Exchange*, 63 Cal. App. 4th 1022 (1998).  STG breached its duty to defend

2   when it falsely asserted it was defending without a reservation of rights, used its panel counsel,

3   and then attempted to raise coverage issues it had previously waived.

4                                        **<u>CONCLUSION</u>**

5           For each of the above-stated reasons, this Court should deny STG's motion to dismiss.

6   The Bank has pled facts showing it suffered loss and damage stemming from unmarketability of

7   title that fall within the coverage grant of the policy.  STG has failed to carry its burden of

8   proving its exceptions to coverage apply.  The case law cited by STG does not support dismissal

9   of the Banks' claims for breach of contract and breach of the implied covenant of good faith and

10  fair dealing.

11                                  Respectfully submitted,

12                                  BOUTIN GIBSON DI GIUSTO HODELL INC.

13

14  Dated:  June 2, 2010            By:   /s/ Robert D. Swanson
                                          Robert D. Swanson
15                                        Michael E. Chase
                                          Attorneys for Bank of Sacramento
16

17                                  LAW OFFICES OF ANDRE HASSID

18

19  Dated:  June 2, 2010            By:   /s/ Andre Hassid
                                          Andre Hassid
20                                        Attorneys for Bank of Sacramento

21

22

23

24

25

26

27

28

                                        -26-